## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **CENTURY ACRES, INC., on behalf of itself, and all others similarly situated,** | : : : : | C. A. No. |
|  | : | **CLASS ACTION** |
| **Plaintiff** | : : |  |
| v. | : : |  |
| **MONSANTO COMPANY,** | : : | **JURY TRIAL DEMANDED** |
| **Defendant.** | : : |  |

## COMPLAINT

Plaintiff Century Acres, Inc. ("Plaintiff") brings this action on behalf of itself and all others similarly situated, and alleges as follows on personal knowledge as to all matters relating to itself, and on information and belief and based upon the investigation of its counsel as to all other matters:

### I.  NATURE OF THE CASE

1.      Defendant Monsanto Company ("Monsanto") is the world's leading agricultural biotechnology company.  It develops and manufactures various agricultural products including: (a) seeds containing genetically modified traits tolerant to glyphosate-based herbicides; and (b) glyphosate-based herbicides sold under the name "Roundup."  In 2000, Monsanto had over $5 billion in total sales, 40% of which was attributable to Roundup.

2.      Plaintiff is a family farming enterprise in the State of Wisconsin.  In this antitrust action, Plaintiff alleges that Monsanto has violated federal and state antitrust laws by using its monopoly power in various markets and other unlawful agreements and tactics to restrain competition and maintain its monopoly in the market for glyphosate herbicides, enabling it to charge

1

Plaintiff and others similarly situated supra-competitive and artificially inflated prices for Roundup. As a result, Plaintiff and members of the class have suffered damages.

3.    Plaintiff also seeks to enjoin Monsanto's ongoing use of various anticompetitive tactics that have (and will) limit, deter, or impede competition from other herbicides, including lower-priced generic glyphosate. Through its anticompetitive practices, Monsanto has limited (and will continue to limit) the availability of competing herbicides at their lowest, fully-efficient prices. This in turn has reduced the pressure on Monsanto's prices for its glyphosate products. Plaintiff and members of the class have accordingly been denied the benefits of free and open competition, and have been forced to pay artificially inflated and non-competitive prices for glyphosate herbicide.

4.    In September 2000, Monsanto's patent for Roundup expired, a significant event that should have opened the market to competition from competing glyphosate herbicides. Under normal, unfettered economic circumstances, the loss of a patent on a high-priced, highly-profitable monopoly product would lead to increased competition as lower-priced generic competitors enter the market. However, during the post patent period, Roundup at various times maintained an 80% (or more) market share of all the glyphosate herbicides sold in the United States, despite the fact that Monsanto charged dealers substantially more for brand-name Roundup than its competitors charged for glyphosate.

5.    Monsanto's ability to charge higher prices for Roundup is the result of a comprehensive anticompetitive scheme which Monsanto began implementing in the 1990s. At that time, Roundup had only limited use for growers because it is a non-selective herbicide that kills both the commercial crop (such as cotton, corn or soybeans) and unwanted vegetation such as weeds. To spur demand for Roundup (and shift sales from competing herbicides), during the 1990s Monsanto

2

started developing genetically modified seeds that contained patented traits which made the seeds tolerant to glyphosate herbicides. This permitted Roundup to be sprayed over-the top of genetically modified crops, killing all unwanted vegetation while leaving the commercial crop unharmed. The market for those seeds grew dramatically. For example, within 2 years after introducing Roundup Ready cotton seeds in 1997, Monsanto's genetically modified seeds constituted 40% of all the cotton seeds planted in the United States, and by 2005 (8 years after the seeds were introduced), Monsanto's genetically modified seeds constituted 90% of all the cotton seeds sold in the United States. Similarly, nearly all of the soybeans sold in the U.S. contain Monsanto's genetic traits because there are almost no conventional, non-genetically modified soybeans sold in the United States, and virtually all (if not all) of the herbicide-resistant soybeans sold in the US contain Monsanto's Roundup Ready gene trait.

6.    Significantly, if other non-selective herbicides are sprayed over Roundup Ready crops, the crops could be damaged or killed. Because Roundup Ready seeds can tolerate only glyphosate herbicides, and patented Roundup was the only glyphosate herbicide on the market at the time, there was a rapid and dramatic shift in herbicide sales. Within a few years after Monsanto introduced its glyphosate-tolerant seed traits, Roundup accounted for approximately 80% of all agricultural herbicide sold in the United States. Concurrently, other types of herbicides were forced out of the market and competing herbicide manufacturers (such as Dow, Dupont and others) discontinued sales of their competing products.

7.    Monsanto has been able to maintain its glyphosate herbicide monopoly through a comprehensive anticompetitve and exclusionary scheme that has involved, among other things, Monsanto's unlawful leveraging of its monopoly (or monopolies) in the market for genetically

3

modified seed traits. As described in greater detail below, Monsanto maintained its seed trait monopolies by blocking the development of competing seeds that could tolerate non-glyphosate herbicides. Monsanto was able to block the development of competing seeds by, among other things: (a) acquiring seed companies that were developing genetically modified seed technology; (b) killing those projects that could have led to the development of genetically modified seeds that could tolerate non-glyphosate herbicide; and (c) entering into exclusive-dealing licenses with seed companies and dealers that denied actual and potential competitors access to critical developmental, marketing and distribution channels.

8.      These efforts to block the development of competing genetically modified seeds had a direct affect on Monsanto's glyphosate herbicide monopoly. Had competing seeds been developed, demand for non-glyphosate herbicides would have increased. This, in turn, would have increased the competition to Roundup, both reducing its market dominance and Monsanto's ability to charge monopoly prices.

9.      Monsanto was able to unlawfully maintain its glyphosate herbicide monopoly, even after its patent expired, by employing various exclusionary tying and bundling practices which: (a) penalized and punished dealers and wholesalers who sold or desired to sell more than a limited amount of generic Roundup; and (b) coerced/induced growers to buy Roundup virtually exclusively even though cheaper generic herbicides were available.

10.     The direct and proximate effect of Monsanto's anticompetitive conduct has been to unlawfully maintain its monopoly in the market for glyphosate herbicides and to command artificially inflated and supracompetitive prices for Roundup, which Plaintiff has been forced to pay. Absent Monsanto's anticompetitive and exclusionary conduct, once Monsanto's patent expired in

4

September 2000, free and unfettered competition in the market for glyphosate herbicides would have enabled competitors to enter the market for glyphosate herbicides and forced Monsanto to lower substantially its prices for Roundup.

11.    In this action plaintiff seeks declaratory and injunctive relief under 15 U.S.C. § 26 for Monsanto's violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.§§ 1 and 2, and treble damages under the laws of Wisconsin, W.S.A. § 133.01 *et seq.,* for the overcharges Plaintiff and members of the classes have paid.

## II.  JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 (commerce and antitrust regulation) and 1337 (federal question), as this case arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and Section16 of the Clayton Act (15 U.S.C. § 26).

13.    Venue is proper pursuant to 28 U.S.C. § 1391 (a), because Monsanto resides, transacts business, and has an agent in this district, and is therefore subject to personal jurisdiction in this district. Venue is also proper in this district under 28 U.S.C. §1391 (b) and (c), and §§ 4, 12 and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, 26).

14.    The goods and services at issue are marketed, shipped and sold in and through interstate commerce. The anticompetitive acts alleged herein have substantially affected interstate commerce.

15.    This Court also has diversity jurisdiction under 28 U.S.C. §1332 (d)(2) in that the civil action brought under Wisconsin law is a class action in which the amount in controversy

exceeds the sum or value of $5,000,000 exclusive of interest and costs, and at least one member of the class is a citizen of a State different from Defendant.

16.    This Court further has supplemental jurisdiction of all claims brought under state law pursuant to 28 U.S.C. § 1367.

### III.  THE PARTIES

17.    Plaintiff operates a farm on approximately 1,700 acres in Wisconsin. This land has been farmed by the same family for three generations. Plaintiff was incorporated in 1979. It is a licensed grower of genetically modified corn and soybeans containing Monsanto's glyphosate-tolerant seed traits. During the relevant period and within the State of Wisconsin, Plaintiff purchased Roundup for commercial agricultural purposes at non-competitive and artificially inflated prices.

18.    Defendant Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri. Monsanto is the world's leading agricultural biotechnology company, producing and developing agricultural products and pharmaceuticals. Monsanto had over $5 billion in total sales in 2000. Also in 2000, $2 Billion, or approximately 40%, of Monsanto's sales were attributable to sales of Roundup. In addition to its production and sale of herbicides, Monsanto produces and/or licenses to other seed companies multiple types of biotechnology seed traits including cotton traits, corn traits and soybean traits. Monsanto owns or controls large groups of formerly independent seed and biotechnology companies that develop and market genetically modified seed. As used herein, "Monsanto" refers to Monsanto Company and all of its subsidiaries and affiliated companies and corporations.

## IV. **TRADE AND COMMERCE**

19.    Monsanto's acts alleged herein have taken place in and affected United States trade and commerce, and have unlawfully and unreasonably, directly, substantially and foreseeably restrained such trade and commerce.

20.    Monsanto sells and ships substantial quantities of biotechnology seed traits and "Roundup" glyphosate herbicide products in interstate commerce and receives payment for the seed or the use of proprietary genetic traits across state boundaries. As reported by Monsanto, sales of "Roundup" glyphosate herbicide products during the relevant period were approximately $2 billion per year.

## V. **CLASS ALLEGATIONS.**

### **The Federal Injunction Class**

21.    Plaintiff brings this action on behalf of himself and, under Fed. R. Civ. P. 23(b)(2), as representative of a class consisting of the following:

> All persons and entities (excluding Monsanto and its officers, directors and employees, coconspirators and governmental entities) who purchased Monsanto's Roundup herbicides in the United States for commercial agricultural purposes at any time from February 27, 2003 to the present (the "Federal Injunction Class").

22.    This class is so numerous and geographically dispersed that joinder of all members is impractical. The exact number and identity of the members of the Federal Injunction Class are unknown to the plaintiff at this time, as such information is exclusively in the hands of defendant, but the number of class members is estimated to number in excess of 100,000.

7

23.     Plaintiff will fairly and adequately protect the Federal Injunction Class' interests. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other class members.

24.     Plaintiff's claims are typical of the claims of the other Federal Injunction Class members' claims. Plaintiff and all members of the class were injured and damaged by defendant's wrongful conduct alleged herein.

25.     Plaintiff is represented by experienced and able counsel competent in the prosecution of complex class action and antitrust litigation.

26.     There exist in this litigation questions of law and fact common to all class members, including but not limited to:

      a.     Whether the product markets alleged in this complaint constitute relevant antitrust product markets;

      b.     Whether the United States constitutes the relevant antitrust geographic market in which to evaluate Monsanto's conduct;

      c.     Whether Monsanto engaged in actions that had as their purpose and effect, among other things, the suppression of competition in unreasonable restraint of trade in violation of §1 of the Sherman Act;

      d.     Whether Monsanto's conduct constituted unlawful monopolization in violation of §2 of the Sherman Act;

      e.     Whether and to what extent Monsanto's alleged wrongful conduct caused injury to the business and property of the members of the Federal Injunction Class; and

      f.     Whether Monsanto's violations of law are continuing such that injunctive relief under 15 U.S.C. §26 is appropriate.

27.     The above common questions of law and fact will predominate over any individual issues that may arise in this litigation. This class action is the superior method for the fair and

efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons to prosecute their claims in singe forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

**The Wisconsin Indirect Purchaser Class**

28.     Plaintiff also brings this action on behalf of itself and, under Fed. R. Civ. P. 23(b)(3), and the laws of the State of Wisconsin, W.S.A. § 133.01, *et seq.*, as representative of a class consisting of the following:

> All persons and entities (excluding Monsanto and its officers, directors and employees, coconspirators and governmental entities) who purchased Monsanto's Roundup herbicides in the State of Wisconsin for commercial agricultural purposes at any time from February 27, 2001 to the present (the "Wisconsin Indirect Purchaser Class"). The Wisconsin Indirect Purchaser Class does not include persons who purchased Monsanto Roundup herbicides for resale.

29.     This class is so numerous and geographically dispersed that joinder of all members is impractical. The exact number and identity of the members of the Wisconsin Indirect Purchaser Class are unknown to the plaintiff at this time, as such information is exclusively in the hands of Defendant, but the number of class members is estimated to number in excess of 1,000.

30.     Plaintiff will fairly and adequately protect the Wisconsin Indirect Purchaser Class' interests. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other class members.

31.     Plaintiff's claims are typical of the claims of the other Wisconsin Indirect Purchaser Class members' claims. Plaintiff and all members of the class were injured and damaged by defendant's wrongful conduct alleged herein.

9

32.     Plaintiff is represented by experienced and able counsel competent in the prosecution

of complex class action and antitrust litigation.

33.     There exist in this litigation questions of law and fact common to all class members,

including but not limited to:

- a.     Whether the product markets alleged in this complaint constitute relevant antitrust product markets;

- b.     Whether the United States constitutes the relevant antitrust geographic market in which to evaluate Monsanto's conduct;

- c.     Whether Monsanto engaged in a conspiracy, combination or contract that had as its purpose and effect, among other things, the suppression of competition in unreasonable restraint of trade in violation of W.S.A. § 133.03(1);

- d.     Whether Monsanto's conduct constituted unlawful monopolization in violation of W.S.A. § 100.03(2);

- e.     Whether and to what extent Monsanto's alleged wrongful conduct caused injury to the business and property of the members of the Wisconsin Indirect Purchaser Class; and

- f.     The appropriate measure of damages to the Wisconsin Indirect Purchaser Class.

34.     The above common questions of law and fact will predominate over any individual issues that may arise in this litigation. This class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly situated persons to prosecute their claims in singe forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

10

## VI.  **THE RELEVANT ANTITRUST MARKETS**

35.    The relevant geographic market for the product markets at issue in this case is the United States.

### **Relevant Herbicide Markets**

36.    Glyphosate herbicides used for commercial agricultural purposes constitute a relevant product market in which to analyze Plaintiff's claims.

37.    Glyphosate herbicides are non-selective, in that they do not distinguish between a commercial crop (such as cotton, corn or soybeans) and unwanted vegetation such as weeds. Glyphosate herbicides are easy to use, environmentally safe, and effective in killing a broad spectrum of weeds. Because glyphosate is the only herbicide that can be sprayed over Monsanto's Roundup-Ready genetically-modified crops, the price of glyphosate herbicides is not significantly constrained by the price of non-glyphosate herbicides. For farmers who wish to spray herbicides over their crops, only competing  glyphosate herbicides can act as a constraint on the price of Monsanto's glyphosate products but, as noted below, Monsanto effectively prevented the entry of such competitors during the period following the expiration of its glyphosate patent.

38.    Monsanto has monopoly power in the market for glyphosate herbicide in the United States.  Monsanto markets and sells its glyphosate herbicides under the brand name "Roundup", including "Roundup WeatherMAX," "Roundup UltraMAX" and "Roundup OriginalMAX." For years after its patent expiration, Roundup constituted  more than 80% of the glyphosate herbicide marketed in the United States.

39.    Monsanto has monopoly and/or market power over the price of glyphosate herbicides and has exercised that power to charge and/or command supra-competitive prices for Roundup and

11

to exclude potential competitors. Monsanto has erected significant barriers to entry into the glyphosate market, including restrictive seed trait licensing agreements and marketing programs penalizing the sale of competing brands of glyphosate, discussed further below. These artificial barriers, when combined with the natural barriers to entry (such as a competitor's need to make substantial investments in a manufacturing plant, find reliable, competitively-priced sources for hard-to-find input chemicals, and overcome a number of time-consuming regulatory hurdles), have effectively precluded the entry of lower-priced competitors. This is true despite the fact that Monsanto charges a premium for its glyphosate products.

40.    Alternatively, non-selective herbicides, which include glyphosate herbicides, used for commercial agricultural purposes constitute a relevant product market. Monsanto has monopoly power in the non-selective herbicide market and possesses a market share in excess of 80%. As set forth in paragraph above, barriers to entry into the non-selective herbicide market, including those created by Monsanto, are high.

### Relevant Biotechnology Seed Trait Markets

41.    Biotechnology has made possible the introduction of new genetic characteristics, or "transgenic events" into plant seeds. The insertion of a desirable transgenic event into a seed alters the seed's characteristics conferring a desirable "trait" in the seed. Among the biotechnology seed traits most widely used are those that make a particular crop glyphosate-tolerant and those that confer pesticide-resistant traits.

### A.    Glyphosate-Tolerant Seed Traits

42.    Glyphosate-tolerant seed traits constitute a relevant product market. Currently there are several crop-specific glyphosate-tolerant seed traits commercialized in the United States,

12

including soybean, cotton and corn. As of 2004, genetically modified crop seeds accounted for 85 percent of all U.S. soy acreage, 45 percent of all corn acreage and 76 percent of all cotton acreage. In 2003, 84 percent of U.S. canola acreage was genetically engineered.

43.    Monsanto has monopoly and/or market power in the market for glyphosate-tolerant seed traits which it markets under the name "Roundup Ready." These include "Roundup Ready Corn," "Roundup Ready Cotton," "Roundup Ready Soybeans," "Roundup Ready Canola" and "Roundup Ready Alfalfa." Upon information and belief, during the relevant period:

(a) glyphosate-tolerant soybean seeds containing Monsanto seed traits constituted over 95% of the glyphosate-tolerant soybean seeds sold in the United States;

(b) glyphosate-tolerant cotton seeds containing Monsanto seed traits constituted over 90% of the glyphosate-tolerant cotton seeds sold in the United States; and

(c) glyphosate-tolerant corn seeds containing Monsanto seed traits constituted over 95% of the glyphosate-tolerant corn seeds sold in the United States.

44.    As alleged herein, there are substantial barriers to entry with respect to glyphosate-tolerant seed traits which include the considerable time and expense to develop seed traits and obtain the necessary regulatory approvals. Furthermore, as alleged herein, Monsanto's exclusionary conduct has imposed additional barriers to entry by foreclosing actual and/or potential competitors in the market for glyphosate-tolerant seed traits from access to various critical manufacturing and distribution assets and channels.

45.    Alternatively glyphosate-tolerant corn traits, glyphosate-tolerant cotton traits, glyphosate-tolerant soybean traits, glyphosate-tolerant canola traits and glyphosate-tolerant alfalfa traits constitute relevant product markets or sub-markets of the broader market for glyphosate-tolerant seed traits defined above.

13

### B.    Pest-Resistant Seed Traits

46.    Pest-resistant seed traits constitute a relevant product market. Pest-resistant seed traits provide protection against various insects and pests such as European Corn Borer, Rootworm and other lepidopteran insect pests. Monsanto has monopoly power in the market for pest-resistant seed traits which it markets under the names "YieldGard Corn Borer", "YieldGard Rootworm", "YieldGard Plus" (a combination of YieldGard Corn Borer and YieldGard Rootworm), "Bollgard Cotton" and "Bollgard II Cotton." Upon information and belief, Monsanto's share of the pest-resistant seed trait market is in excess of 80%.

47.    Alternatively, each of the pest-resistant seed traits identified above constitutes a separate product market or submarket of the broader pest-resistant seed trait market.

48.    As set forth above, there exist substantial natural barriers to entry into the market for pest-resistant seed traits or alternatively the submarkets for pest-resistant seed traits which include the considerable time and expense required to develop the seed traits and obtain the necessary regulatory approvals. Monsanto has erected additional barriers to entry through its imposition of restrictive seed-trait patent licenses on seed companies.

49.    Monsanto has also placed various restrictions on the ability of seed companies who develop seeds for farmers to combine or "stack" various Monsanto GM seed traits, such as glyphosate-tolerant seed traits with pest-resistant seed traits. As alleged below, the way that Monsanto tied and bundled its seed traits at the seed company level has created additional barriers to entry for companies wishing to sell either competing herbicide-resistant seed traits or competing herbicides. This is so because seed companies have been deterred from: (a) buying competing herbicide-resistant seed traits from Monsanto's rivals (or helping Monsanto's rivals develop

14

competing herbicide-resistant seed traits); and/or (b) promoting a glyphosate herbicide other than Roundup.

## VII.  FACTUAL ALLEGATIONS

### A.    Weeds and Herbicides

50.    Weeds reduce crop yield and quality.  To control weeds, growers use significant amounts of herbicides, or chemical compounds that destroy or inhibit the growth of undesirable plants.  Herbicides are usually used as part of a field maintenance program, either prior to, or in conjunction with, the planting and growing of the crop.  As a general matter, these herbicides can be classified by type of activity:  (a) *selective herbicides* that are tolerated by the crop but will kill or suppress one or more weeds that infest the crop, and (b) *non-selective herbicides* that are active on all vegetation that is present at the time of application, including the crop.  Non-selective herbicides do not distinguish between a commercial crop (such as cotton, corn or soybeans) and other unwanted vegetation such as weeds.

51.    Because there is no single selective herbicide that can control all types of weeds with equal effectiveness, growers must apply a combination of selective herbicides, either at the same time or in sequence, to control important target weeds.  Selective herbicides are usually classified by (a) the kind of weeds they control (*e.g.*, grass or broadleaf), (b) the timing of the application (pre-emergence or post-emergence of the crop), and (c) the length of time the herbicide controls weeds (residual control).

52.    Since 1974 Monsanto has manufactured and sold a non-selective herbicide called "Roundup," of which glyphosate is the active ingredient.  Because it is a non-selective herbicide,

15

Roundup kills a wide variety of vegetation, without distinguishing between valuable crops and unwanted weeds.

**B.    Biotechnology Crop Seed Traits**

53.    In or about 1992, Monsanto began investigating the creation of genetically-modified crops. In 1997, Monsanto commercially introduced genetically modified cotton seeds that were glyphosate-tolerant and which would therefore allow Roundup to be applied post-emergence, or "over the top" of the cotton crop, without destroying the plants. These glyphosate-tolerant cotton varieties are marketed under the Monsanto trademark "Roundup Ready." In 1998, Monsanto introduced genetically modified Roundup Ready corn seeds. Since then Monsanto has commercialized soybean, alfalfa and canola seeds containing traits conferring Roundup tolerance.

54.    In addition to glyphosate-tolerant seed traits, Monsanto also developed pest-resistant biotechnology traits such as corn seed resistant to the European Corn Borer ("ECB") and rootworm which were created by the insertion of the gene for Bacillus thuringensis ("Bt") into the corn seed genome. Monsanto sells its pest-resistant corn seed traits under the name "YieldGard." Monsanto has also developed pest-resistant cotton seed traits which it sells under the name "Bollgard." Monsanto has monopoly power in pest-resistant seed traits, since the vast majority (if not all) pest-resistant seeds use a patented, Monsanto pest-resistant trait.

55.    As alleged in more detail below, Monsanto has conditioned (a) the amount of patent licensing fees that seed companies have to pay Monsanto regarding pest-resistant traits, and (b) the rebates that dealers and distributors receive from Monsanto for the sale of pest-resistant seeds, on seed company and dealer conduct with regard to other products, such as herbicide-resistant seed traits and Roundup. Thus, if a seed company promotes either competing herbicide-resistant seeds

16

or a competing herbicide, or a dealer or distributor sells too much of a competing herbicide, Monsanto imposes financial penalties in connection with pest-resistant seeds. In other words, if seed companies, distributors or dealers do not sufficiently support the maintenance of Monsanto's market share in the markets for herbicide or herbicide-resistant seed traits, then Monsanto will penalize those entities in a different product market where Monsanto has monopoly power. By financially bundling pest-resistant seed traits with herbicide-resistant seed traits and Roundup, Monsanto has used its monopoly power in pest-resistant traits to exclude competition in the relevant herbicide market, and obtain and maintain monopoly power in that market.

56.    Since the introduction of Roundup Ready cotton seeds in 1997, the number of acres planted with Monsanto's Roundup Ready seed traits has grown dramatically. By 1999, Roundup Ready cotton seeds accounted for nearly six million of the 14.6 million acres of cotton grown in the United States in that year. On information and belief, as of 2000, Roundup Ready cotton seeds comprised approximately 50% of all the cotton seeds grown in the United States. As of 2005, Roundup Ready Soybeans seeds constituted 80% of all soybean seeds grown in the United States, and Roundup Ready Corn seeds constituted 45% of the corn seeds bought in the United States.

57.    Monsanto licenses its genetically-modified seed traits to independent seed companies who mass produce seeds that contain a combination of conventional plant traits with various genetically-modified seed traits. Over the last several years, a few hundred seed companies have been the source for virtually all of the farmers' corn, cotton and soybean seeds. A limited number of the seeds containing Monsanto's patented traits are produced by various Monsanto-owned subsidiaries discussed below. However, during the last several years the bulk of genetically-modified seeds have been produced and sold to farmers by independent seed companies, who pay

17

Monsanto a patent royalty or fee for the right to incorporate Monsanto's patented genetic traits into the seeds that these seed companies produce and sell.

## C. Monsanto's Domination of the Market for Biotechnology Seed Traits

### a. Monsanto Suppressed and Blocked the Development of Competing Seed Traits Through the Acquisition of Actual and Potential Competitors

58. Starting in or around 1996, in order to realize its strategy of obtaining a seed trait monopoly, Monsanto embarked on an $8 billion acquisition program whereby it acquired, merged with, or obtained an ownership interest in a large number of then existing and leading biotechnology and seed companies. Monsanto's plan also included the suppression of potentially competing herbicide-tolerant trait technologies – such as glufosinate-tolerant traits – that could compete with Monsanto's Roundup Ready technology. Monsanto's strategy – which it successfully implemented – was to impede or limit the number of competing herbicide-resistant seeds that were available in the market.

59. Monsanto's end goal was to foreclose and impair competition and the pressure that such competition would put on the price of Roundup. Had competing seeds been developed that were resistant to glufosinate or other non-selective herbicides, demand for these herbicides would have increased, in direct competition with Roundup. This competition would have forced Monsanto to lower its Roundup prices.

60. In 1996, Monsanto acquired a minority interest in DeKalb Genetics Corporation ("DeKalb"), which was seeking to develop a hybrid corn seed. Monsanto also acquired a license to the GA21 event which DeKalb was jointly developing with Rhone-Poulenc (later Bayer), as well as the intellectual property rights for an ECB-resistant corn trait seed and a seed trait that provided

18

resistance to glufosinate, an alternative non-selective herbicide that competed with glyphosate. In 1998 Monsanto acquired the remaining shares in DeKalb and withdrew all support for the development of glufosinate-tolerant corn traits. Thus, as a result of its acquisitions, Monsanto effectively suppressed the development and commercialization of a seed trait imbuing tolerance to other, non-glyphosate herbicides, and in so doing eliminated a potential competitor to its own Roundup Ready or glyphosate-tolerant traits.

61.     During this period, AgrEvo (an Aventis predecessor) was also trying to develop a glufosinate-based seed trait through a collaboration agreement with Asgrow, a soybean and corn seed company. Had AgrEvo been able to develop such seeds, growers could have sprayed glufosinate over glufosinate-tolerant crops. In or about February 1997, however, Monsanto acquired Asgrow and promptly killed the glufosinate project.

62.     In September 1997, Monsanto acquired Holdens Foundation Seed ("Holdens"), another large seed and technology company, and in 1998 similarly caused Holdens to withdraw its support for glufosinate-tolerant corn traits.

63.     During this period Monsanto also acquired various other seed and seed technology companies such as Argrocetes (1996), Ecogen (1996), Calgene (1997) and Plant Breeding International (1999) (a Brazilian seed company), all of which had been involved in the development and/or production of biotechnology traits or seeds.

64.     Through its acquisitions from 1996 to 1998, Monsanto gained control over approximately 45% of the foundation corn seed production in the United States and 70% of the foundation corn seed sold or licensed to independent seed companies. Because foundation seed companies like Dekalb, Holdens and Asgrow play a critical role in the testing, development and

19

commercialization of new types of seeds, Monsanto's acquisition of those companies substantially reduced the number of actual and/or potential competitors that could otherwise compete with Monsanto in the emerging market for genetically-modified glyphosate-tolerant seed traits.

65.    Moreover, by eliminating ongoing projects to develop seeds that were tolerant of other types of herbicide, Monsanto ensured that its domination of the market for genetically modified herbicide-tolerant crop seed and Roundup would be long term. More specifically, a very long lead time is needed to develop and commercialize a genetically modified herbicide-resistant crop seed. As an initial matter, it can take several years to identify the genetic traits that will make a plant herbicide-tolerant. Once those genetic traits are identified, it may take a substantial amount of time to isolate and extract those genetic traits so that they can be incorporated into a corn, soybean, cotton, or other type of seed. Once that is done, it takes several growing cycles to identify and isolate exactly which forms of the seeds will grow best in various conditions and in varying climates. Finally, once the appropriate seeds are created, it will take several growing cycles to amass enough seeds to start selling commercially to farmers. Consequently, by eliminating existing projects to develop seeds that tolerated other herbicides, Monsanto delayed the market entry of such seeds for several years.

66.    These acquisitions by Monsanto eliminated competition in the developing market for genetically-modified crop seeds, prevented the development of genetically-modified crop seeds that would be tolerant of competing herbicides, and thereby stifled competition in the related herbicide market. It was clearly understood by observers at the time that by eliminating or co-opting actual or potential rivals that might create seeds that could be used with other competing herbicides Monsanto's acquisitions were intended to protect Monsanto's herbicide business. A March 1997 article in the agricultural publication, Seedling, stated that:

20

Monsanto's longtime patent monopoly on Roundup will expire in 2000, so the company could lose its clamp on those sales very fast. Enter biotechnology. By having a gene from a microorganism inserted, crop plants can now be showered directly with the chemical. The idea, for Monsanto, is to extend the market life of Roundup beyond the patent. By creating crops tailored to withstand Roundup, Monsanto will keep its herbicide sales secure.

\* \* \*

The Holden purchase is like buying one of the best gene banks in the world, if gene banks were normally for sale. On December 2, 1996, the investment banking firm Dain Bosworth predicted in a report the sale of Holden and estimated the price at \$300-500 million: "Holden's high price has very little to do with Holden as a seed company and a lot to do with the battle between chemical giants for future sales of herbicides and insecticides."

(emphasis added). Thus, it was recognized in 1997 that Monsanto's seed company acquisitions were connected, at least in part, to the herbicide and insecticide battles that would be won or lost based on the types of seed traits that were available in the market.

**b      Monsanto Used Exclusive Dealing Contracts With Independent Seed Companies To Block Key Channels That Were Critical To The Full Development of Competing Seed Traits**

67.    In addition to eliminating actual competition through acquisitions, Monsanto also pursued a strategy of neutralizing potential competitors by entering into restrictive licensing agreements with independent seed companies. As a result of the success of Monsanto's aggressive marketing of its genetically-modified crops, seed companies that grow and sell seeds for use by farmers were interested in obtaining a patent license so that they could include Monsanto's patented gene technology in the seeds that they sold.

68.    Starting in or about 1997, Monsanto entered into numerous long-term (typically ten year) licensing agreements with hundreds of seed companies who grow the seed containing Monsanto's biotechnology seed traits for resale to the market. These agreements: (a) bundled together the patent license fees for various types of Monsanto seed traits; and (b) provided that any

21

seed company who sold more than an *de minimus* amount of seeds containing a competing herbicide trait would be penalized by having to pay substantially higher patent license fees for all Monsanto seed trait products sold. For example, Monsanto's licenses with seed companies typically provide that Monsanto will pay substantial incentive rebates and waive royalty fees provided the seed company's sales of Monsanto's products, per seed trait and in combination, constitute 70-85% of a seed company's total sales.

69.    Monsanto's patent licenses allow seed companies to produce various seeds that may contain: (i) Monsanto's herbicide-resistant corn traits, (ii) Monsanto's corn-borer resistant-corn traits, (iii) Monsanto's root worm-resistant corn traits, (iv) Monsanto's Roundup Ready herbicide-resistant cotton traits; (v) Monsanto's pest-resistant cotton traits; (vi) Monsanto's herbicide-resistant soybean traits; and/or (vii) various combinations of these traits . If a seed company's sales fall below the specified percentage threshold for even one type of seed variety, however, Monsanto can penalize the seed company for all of the other seed traits produced and/or sold by the seed company by, among other things, withholding rebates and other financial incentives. Thus, for example, if a seed company producer sells too many soybean seeds containing a rival's competing herbicide-resistant soybean trait (were one available), then Monsanto can penalize the seed company by making it pay higher patent royalties for seed traits in corn or cotton. In such a situation, Monsanto uses its monopoly power in one seed-trait market to penalize the seed company for favoring Monsanto's rival in another seed-trait market.

70.    Monsanto's use of licenses to block the development and growth of competing types of biotechnology seed traits and herbicides was the focus of its 1996 strategy called the "Monsanto Maize Protection Business Plan." The Monsanto Maize Protection Business Plan outlined a scheme

22

to obtain and exercise monopoly control in the markets for biotechnology seed traits by licensing seed trait technology (including the glyphosate-tolerant technologies) to independent seed companies who might otherwise compete with Monsanto. The Monsanto Maize Protection Business Plan set forth, among other things, the following plan of action:

Monsanto should enter into commercial agreements with the Maize seed companies that comprise 90% of the sales in the U.S. hybrid market;

If we [Monsanto] can secure 90% of the distribution, it will be difficult for our competitors to gain significant share long term;

It will be more difficult for other suppliers of traits to demand dollars and expect gene switching when seed companies are already paying Monsanto;

Patents for Roundup Ready genes have been issued. Using these patents and agreements with Maize seed companies, Monsanto can prevent the use of any other glyphosate product in-crop [a.k.a. Roundup Ready competitor] to corn.

While the Monsanto Maize Protection Plan addressed genetically modified corn seeds, upon information and belief, the foregoing strategy became the blueprint for Monsanto's overall licensing strategy to restrict competition in the biotechnology seed traits and related markets.

71.     By using bundled rebates and punitive patent licensing fees at the seed company level, Monsanto has leveraged its market power across multiple product markets to penalize seed companies that threatened to develop competing herbicide-resistant seeds. As alleged above, had competing seeds been developed that were resistant to glufosinate or another non-selective herbicide, competition to Roundup would have increased, placing competitive pressure on the price that Monsanto could charge for it.

72.     Furthermore, Monsanto's seed-trait patent licenses with seed company's prohibited seed companies from growing or developing new seeds that combined or "stacked" Monsanto's

23

genetic traits with traits that would make the seeds tolerant of other types of herbicides. Thus, for example, a seed company that wished to grow and sell Monsanto's pest-resistant corn could not combine that trait with another company's herbicide-resistant trait. These seed companies were thus locked into non-terminable long-term licenses that prohibited them from developing seeds or traits that were tolerant of both glyphosate herbicides and other non-selective herbicides and/or promoting a glyphosate herbicide other than Roundup.

73.    Finally, the agreements also required the seed companies to use and promote only Roundup herbicides in connection with the Roundup Ready seed they produced. For example:

(a)    In or around 1997, Monsanto sub-licensed to Syngenta the technology for ECB-tolerant corn which Monsanto had licensed from Dekalb in1996, so that Syngenta could develop and market ECB-tolerant seeds. Syngenta was prohibited, however, from promoting the fact that the ECB-tolerant seed was tolerant of glufosinate-based herbicides, thereby suppressing information which would stimulate the demand for glufosinate-based herbicides; and

(b)    In or about April 1992, Monsanto sub-licensed to Pioneer Monsanto's technology for Roundup-tolerant soybean seeds. Under the license agreement, Pioneer agreed to insert Roundup-tolerant gene traits into Pioneer's most promising soybean varietal lines, and that Pioneer would promote only Roundup herbicide for use with its herbicide-tolerant soybeans.

74.    Ironically, while Monsanto was aggressively seeking to sign seed companies to long term licenses with respect to glyphosate-tolerant biotechnology, it turned out that Monsanto did not have any rights to the particular technology its was licensing. As previously alleged, in 1996, Monsanto acquired a minority interest in Dekalb, then a leading biotechnology seed trait company. Dekalb then licensed to Monsanto the intellectual property rights to the GA21 (glyphosate-tolerant) trait that DeKalb was developing in collaboration with Rhone-Poulenc. In 1997, however, Rhone-Poulenc (now Bayer CropScience) sued DeKalb and Monsanto alleging that DeKalb had

24

misappropriated Rhone-Poulenc's GA21 technology. In February 2000, DeKalb was held to have no rights in GA21, *Rhone-Poulenc Agro, S.A. v. Monsanto Co. And Dekalb Genetics Corp.*, No. 1:97CV1138, 2000 U.S. Dist. LEXIS 21330 (M.D.N.C. Feb. 8, 200), *aff'd in relevant part*, 272 F.3d 1335 (Fed. Cir. 2001).

75.     Recognizing that the glyphosate-tolerant biotechnology rights it had licensed to numerous seed companies was now non-existent, Monsanto required its "licensees" to switch to NK603 (a glyphosate-tolerant event Monsanto owned) and sign new, equally restrictive NK603 contracts.

76.     In or about February 2004, Syngenta Seeds, Inc., a direct competitor of Monsanto, acquired the rights to the GA21 glyphosate-tolerant corn trait from Bayer CropScience, and announced its plan to market a glyphosate-tolerant seed trait in competition with Monsanto. Syngenta is also the manufacturer of glyphosate herbicide sold under the name Touchdown.

77.     According to an antitrust complaint filed by Syngenta in this Court, *Syngenta Seeds, Inc., v. Monsanto Company and Monsanto Technology, LLC,* C.A. No. 04-908-SLR, once Monsanto learned of Syngenta's efforts to develop and market its own glyphosate-tolerant corn seed traits based on the GA21 event, Monsanto prohibited its seed company licensees from developing a seed using the GA 21 event, effectively foreclosing competition from Syngenta in glyphosate-tolerant corn traits.

78.     Monsanto's efforts to block Syngenta's GA21-trait corn seeds from the market were significant because Syngenta's entry into the market with a GA21-trait would have created real competition not just for Monsanto's Roundup Ready corn-seeds, but glyphosate herbicides as well. Syngenta now manufactures and sells its own glyphosate herbicide under the name "Touchdown."

25

Had Monsanto not blocked and/or delayed Syngenta's access to the market, a competing biotechnology corn seed trait and a competing glyphosate herbicide would have been available.

**D.    Monsanto Exploits its Monopoly in the Gylphosate Tolerant Seed Traits Market to Unlawfully Acquire/Maintain its Monopoly Power in the Glyphosate Herbicide Market**

79.    As a result of Monsanto's development and the wide acceptance of glyphosate-tolerant seed traits, Monsanto's sales of Roundup increased exponentially. Because the use of Roundup Ready seeds with Roundup herbicide eliminated the need for most other herbicides, there was a dramatic shift to Roundup and an equally significant shift away from other herbicides. Roundup's market share of all herbicides used for cotton increased from 8% prior to 1997 to approximately 50% in 1999. Other previously-dominant herbicide companies found that their sales dramatically declined, and those competitors decided that they would discontinue their competing herbicides and shift to also selling glyphosate once Monsanto's patent expired in September 2000.

80.    Monsanto feared a substantial loss of revenue resulting from the expiration of its glyphosate patent (Roundup had accounted for almost 50% of the company's revenue) and the expected competition from other manufacturers such as Dupont or Dow who might sell generic versions of Roundup. Indeed, in an October 2000 stock prospectus filed with the SEC, Monsanto identified generic competition in the glyphosate herbicide market as a "principal risk" to Monsanto, and its 2001 Annual Report stated that Monsanto's "most important near-term priority is [to] . . . limit potential price erosion" of Roundup. To protect its glyphosate monopoly from generic competition, Monsanto undertook various steps at the manufacturer and seed company level to prevent the emergence of competing generic forms of glyphosate. For example, Monsanto entered into supply agreements in the late 1990s with DuPont, Dow, Novartis, Nufarma, Cyanamid, BASF

26

and other chemical companies under which: (a) Monsanto would supply the glyphosate salt used in Roundup (which was still patented at the time); and (b) the companies would have a license to produce and sell herbicides containing Monsanto's patented glyphosate-salts under their own brand names. In a number of instances, Monsanto actually supplied, and still supplies, competitors (such as Dupont or Dow) with not only the basic, chemical ingredients, but the entire finished product wrapped in the competitors' packaging. These supply agreements limited a competitor's incentive to invest in building glyphosate factories, thereby: (a) ensuring that competitors did not have the infrastructure and equipment to effectively compete with Monsanto; (b) perpetuating Monsanto's control over the key glyphosate inputs; and (c) maintaining, if not increasing, Monsanto's control over the herbicide market.

81.    Furthermore, to prevent price erosion and maintain its monopoly profits from Roundup, Monsanto pursued a systematic licensing and marketing strategy that leveraged its monopoly power in the seed trait markets (including but not limited to glyphosate-tolerant seed trait market) to (a) coerce and/or pressure dealers and distributors to substantially restrict the amount of generic glyphosate herbicides they carried and sold to growers and (b) require growers who wished to plant seeds that contained Monsanto's biotechnology traits to use Roundup herbicide virtually exclusively rather than a competitor's generic equivalent herbicide product.

82.    Monsanto's dealers and distributors are subject to a variety of restrictive conditions that limit their ability and incentive to sell competing glyphosate herbicide products, and which in fact penalize them for selling non-Monsanto herbicides. These restrictive conditions include, for example, minimum percentage sales requirements that typically require a dealer's Roundup sales to constitute 80% or more of the dealer's total glyphosate herbicide sales. Under Monsanto's

27

arrangements with dealers and distributors, if a dealer's or distributor's total sales of Roundup herbicides falls below the stipulated percentage, the dealer or distributor forfeits all, or a substantial portion, of the rebates otherwise payable on all of its Roundup sales. In some instances, Monsanto is deliberately vague as to the percentage of glyphosate sales that must be Roundup, so the only way a dealer or distributor can be sure that it will not lose any rebates is to make Roundup its exclusive glyphosate herbicide. The rebates a dealer receives from Monsanto are a significant part of the dealer's income, since dealer and distributor markups are generally small, and dealers therefore must strictly adhere to Monsanto's percentage sales requirements.

83.     Upon information and belief, Monsanto has various programs, such as its so-called "Action Pact Program," pursuant to which Monsanto pays dealers and distributors a percentage rebate on (a) their purchases of Roundup herbicide, (b) their purchases of genetically modified seeds containing Monsanto's seed traits from either Monsanto or a separate seed company that licensed the technology from Monsanto, and (c) the substantial "technology fees" which the growers must pay in connection with their use of Monsanto's patented seed trait technology – *provided the dealer's sales to growers meet or exceed Monsanto's market share for Roundup*. Moreover, the rebates available in connection with herbicide purchases, seed purchases, and patent fees are bundled together by Monsanto, and the existence or amount of the rebate that Monsanto ultimately pays to the dealer for sales of any Monsanto genetically modified seed or herbicide product is based on the extent of the dealer's compliance with Monsanto's percentage sales requirements for Roundup. In other words, if more than 10 - 20 % of the dealer's glyphosate herbicide sales are generic, a dealer will be penalized and forfeit all its rebates on Monsanto seed sales and technology fees, not just on its Roundup sales.

28

84. Monsanto's rebate programs are patently exclusionary and lack any procompetitive purpose since they are not volume or cost based. Additionally, there is no procompetitive or non-exclusionary justification for bundling the rebates on Monsanto's seed trait products with the percentage of a dealer's sales of Roundup. In economic terms, Monsanto's rebate program imposes a substantial cost (or penalty) on any dealer or distributor that purchases anything more than a token amount of generic glyphosate herbicides. As a result of Monsanto's rebate programs, dealers and distributors have little or no incentive to purchase, stock or sell generic glyphosate, because if they sell more than a *de minimus* amount, they stand to be penalized by losing the substantial rebates the would otherwise receive on the sale of Monsanto products.

85. By using its various practices to block competitors' access to the primary distribution channels, and stifling the amount of generic glyphosate that competitors could sell, Monsanto impeded and/or deterred rivals from achieving : (a) fully-efficient operations, (b) the lower costs that result from fully-efficient operations; and (c) the lower prices that result from lower operating costs and unfettered competition. Furthermore, by blocking rivals from the primary distribution channels, Monsanto raised its rivals' distribution costs. Thus, even where competing glyphosate is available, (a) the prices are higher than they would have been absent Monsanto's conduct, and (b) the prices will continue to be higher so long as Monsanto's anticompetitive practices remain in place.

86. Finally, Monsanto has also imposed exclusionary and restrictive conditions at the grower level that prevent growers from using generic glyphosate in connection with Monsanto's glyphosate-tolerant seed traits. While Monsanto does not typically sell seeds directly to farmers, Monsanto requires growers to sign a technology license, the Grower's Agreement and Technology Use Agreement ("TUA"), that effectively mandates that they use only Roundup herbicides on

29

Roundup Ready crops. When Monsanto (and its licensed seed companies) first commercialized various Roundup Ready seeds in 1997, Monsanto explicitly conditioned the grant of a license to use its Roundup Ready seed technology on the grower's agreement to purchase and use only Roundup herbicide. For example, from 1998 thru 2000 , the Grower's Agreement provided that

> if a herbicide containing the same active ingredient as a Roundup Ultra herbicide (or one with a similar mode of action) is used over the top of Roundup Ready crops, you (the farmer) agree to use only Roundup branded herbicide.

87.     While the language in Monsanto's more recent Grower's Agreements and TUAs appear to permit a grower to use a non-Roundup glyphosate herbicide in connection with Monsanto's glyphosate-tolerant seed traits, other aspects of the Grower's Agreement demonstrate that this "choice" is illusory and that a grower is still effectively locked into using Roundup virtually exclusively.

88.     When Monsanto first began marketing biotechnology seed traits in 1997, it recognized that farmers would be reluctant to pay the higher prices for those seeds because crop failures were a significant risk, and growers would frequently lose their crops to adverse natural occurrences (such as hail, frost, drought, etc.). Accordingly, to induce growers to buy the significantly more expensive biotechnology seeds, Monsanto included as a component of the Tech Fee and patent/technology license the grower pays, a crop protection program pursuant to which Monsanto agreed to waive the Tech Fee for replacement seeds if the crop failed within the first 60 days after planting. Because, as alleged earlier, the Tech Fee constitutes a substantial component of the grower's seed costs (up to 70%), the crop protection program was and still is a critical factor in a grower's decision to use seed with biotechnology seed traits. Significantly, Monsanto's crop protection program is not otherwise available and cannot be purchased independently by any grower, in large part because Monsanto has exclusive control over its patented seed trait technology, and thus

30

Monsanto has the sole ability to reward or punish growers for their herbicide choices by altering how much, if any, the growers have to pay for Monsanto's seed licenses.

89.    Monsanto has continually acknowledged the importance of the crop protection program to its ability to sell its biotechnology products. For example, Monsanto's website currently describes the crop protection program as "the comprehensive program you [the grower] rely on for trait and herbicide investment protection," and the crop protection program "offers added protection and reduced risk program elements for your farming operation so you can farm with confidence when you use Monsanto technologies and agricultural herbicides. Since 1997, over 236,000 growers have claimed more than $451 million in program benefits."

90.    Up until at least 2000/2001, a grower was automatically entitled to the crop protection program once it paid the Tech Fee. Thus, up until 2000/2001, growers automatically received – at no additional cost – the valuable replacement Tech Fee waiver as part of the growers' original purchase. However, at or about the same time that Monsanto revised its Grower and TUA agreements to give the appearance that a grower could use generic Roundup on Monsanto seed traits, Monsanto modified its crop protection program requirements to make the benefits available *but only if the grower used Roundup*. Growers who continue to use Roundup still receive the replacement Tech Fee waiver at no additional cost as before, but growers that want to use generic glyphosate herbicides are faced with a substantial penalty – the replacement Tech Fee costs. Moreover, to continue to get the benefits of the "Roundup Rewards" program (Monsanto's current name for its crop protection program), the grower must use Roundup not only for over-the-top application, but for general field clearing ("burndown") purposes as well. Monsanto has effectively maintained the same condition in its technology license that requires a grower using Monsanto's biotechnology seed traits to use Roundup virtually exclusively rather than a cheaper generic glyphosate herbicide.

31

91.     The "Roundup Rewards" crop protection program has contributed to Monsanto's exclusionary scheme to eliminate competition in two significant ways. First, the program imposes pricing penalties that punish growers who buy competing glyphosate herbicides, limiting demand for competing products.    Second, the Roundup Rewards crop protection program supports Monsanto's broader exclusionary scheme through a "push" and "pull" strategy. As alleged above, Monsanto has used various types of bundled rebates and other penalties to limit the supply of generic glyphosate herbicides on dealer shelves. This limits competitors' ability to gain access to the markets through dealers that might otherwise "push" the product. Monsanto's Roundup Rewards crop protection program also works to penalize farmers who buy competing glyphosate herbicides, thereby limiting the customer "pull" for competing products. If dealers believed that they could shift all (or virtually all) of their herbicide sales to competing glyphosate herbicides, then dealers that did so would suffer only a limited penalty from the loss of Monsanto's Roundup rebates because the dealers would shift virtually all of their sales away from Roundup, and thus the Roundup penalties would apply to only a small volume of Roundup purchase (although the dealers would still continue be harmed and coerced by the penalties that Monsanto would impose in connection with seed and tech-fee rebates). Because Monsanto's Roundup Reward program has been able to limit the demand for generic glyphosate herbicides, it means that even if a dealer wanted to sell generic herbicides, a substantial amount of its sales would still be brand-name Roundup, and thus the dealer would be seriously penalized, and at serious financial risk, from the loss of the herbicide rebates (as well as the seed and Tech fee rebates).

92.     The combination of both limiting demand for generic glyphosate herbicides through the crop protection program, and limiting supply on distributor and dealer shelves, has enabled .

32

Monsanto to contain and curtail the extent of its competitive risk and market exposure from competing glyphosate products. This, in turn meant that Monsanto was unconstrained by competition and could charge a substantial premium for its brand-name Roundup, because Monsanto knew that it faced only limited competitive exposure due to its efforts to limit grower demand and dealer willingness to sell the competing products. Monsanto would have been forced by competitive pressures to charge substantially lower prices for Roundup absent its exclusionary conduct, and the total, aggregate effect of Monsanto's scheme has enabled it to charge inflated, supra-competitive prices for Roundup.

93.    In sum, as a result of its anticompetitive conduct, Monsanto has unlawfully restrained trade and maintained its monopoly in the market for glyphosate herbicides. The effect of these unlawful agreements and monopolistic conduct has been to limit and impede rivals' ability to distribute their competing glyphosate herbicide products, foreclosing and impairing competition in the glyphosate herbicide market and enabling Monsanto to avoid the natural competitive pressures that would have otherwise forced it to reduce the price paid by Plaintiff and members of the class for Monsanto's glyphosate herbicide.

## VIII.  **INJUNCTIVE RELIEF**

94.    Monsanto's violation of federal and state antitrust law are continuing and the effects thereof will continue unless injunctive relief is granted. Plaintiff has no adequate remedy at law.

33

## COUNT I

### Claim for Injunctive Relief Under 15 U.S.C. §26
### Unreasonable Restraint of Trade in Violation of §1 of the Sherman Act
### Anticompetitive Agreements

95.    Plaintiff realleges the factual allegations of the preceding paragraphs of this Complaint and incorporates them into this Count as if set out in full herein.

96.    Monsanto has monopoly power in the relevant markets for biotechnology seed traits, including the market for glyphosate-tolerant seed traits.

97.    Beginning in or around 1999, and continuing to date, Monsanto has engaged in unlawful contracts, combinations, conspiracies and agreements in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. As a result of Monsanto's anticompetitive agreements and conduct, competition in the market for glyphosate herbicides has been substantially reduced, limited and foreclosed. Monsanto's exclusionary agreements include, for example, (a) exclusionary contracts and agreements with seed companies that have prevented the development of competing herbicide-resistant seeds and the promotion of competing herbicides, and (b) exclusionary agreements with distributors and dealers which have blocked, impeded and/or prevented the ability of rivals selling competing glyphosate to enter the herbicide market, efficiently distribute their product, and/or expand their share of that market.

98.    Plaintiffs and members of the Federal Injunction Class have been, and/or will be, injured in their business and property as a result of Monsanto's aforesaid violations of §1 of the Sherman Act. As a result of Monsanto's conduct, Monsanto has caused Plaintiff and members of the Federal Injunction Class to pay artificially-inflated and supra-competitive prices for Monsanto's Roundup glyphosate herbicide. Absent Monsanto's improper conduct, actual and potential

34

competitors would have been able to enter the market and compete with Monsanto on the merits. Had such competition not been unlawfully foreclosed by Monsanto, free and unfettered competition would have forced Monsanto to lower its prices for Roundup herbicides to competitive levels. As a consequence, Plaintiff and members of the Federal Injunction Class have sustained substantial losses and damage to their business and property.

99.     Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.    Plaintiff and members of the Federal Injunction Class have no adequate remedy at law.

## COUNT II

### Claim for Injunctive Relief Under 15 U.S.C. §26
### Sherman Act § 2 - Unlawful Monopolization
### Monsanto's Unlawful Use/Leveraging of its Seed Trait Monopolies to Eliminate
### Competition in the Glyphosate Herbicide Market

100.     Plaintiff realleges the factual allegations of the preceding paragraphs of this complaint and incorporates them into this Court as if fully set out in full herein.

101.     Monsanto has monopoly power in the relevant markets for biotechnology seed traits, including the market for glyphosate-tolerant seed traits.

102.     In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Monsanto has wilfully and unlawfully maintained and exercised its monopoly power in the relevant markets referred to above by seeking to foreclose competition or to gain a competitive advantage in the glyphosate herbicide market (or alternatively the non-selective herbicide market) by the exclusionary and anticompetitve conduct set forth above.

103.   As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has maintained its monopoly or market power in the glyphosate herbicide market (or alternatively has acquired and/or maintained its monopoly or market power in the non-selective herbicide market), and competition in that market has been unlawfully eliminated or foreclosed.

104.   There is no legitimate business justification for the actions and conduct through which Monsanto unlawfully maintained and exercised its monopoly power in the relevant markets set forth above.

105.   As purchasers of Monsanto's glyphosate herbicides sold under the brand name Roundup (as well as other brands), Plaintiff and members of the Federal Injunction Class have been injured in their business and property as a result of Monsanto's aforesaid violations of §2 of the Sherman Act. Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the market for glyphosate herbicides, and Monsanto would have been forced to lower its prices for Roundup to competitive levels.

106.   Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff and members of the Federal Injunction Class have no adequate remedy at law.

36

## COUNT III

### Claim for Injunctive Relief Under 15 U.S.C. §26
### Sherman Act § 2 - Unlawful Monopolization
### Monsanto's Unlawful Acquisition and/or
### <u>Maintenance of its Glyphosate Herbicide Monopoly</u>

107.    Plaintiff realleges the factual allegations of the preceding paragraphs of this complaint and incorporates them into this Court as if fully set out in full herein.

108.    Monsanto has monopoly power in the glyphosate herbicide market.

109.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Monsanto has wilfully and unlawfully maintained its monopoly power in the glyphosate herbicide market through the coercive, exclusionary and anticompetitve conduct set forth above.

110.    As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has maintained monopoly or market power in the glyphosate herbicide market, and competition in that market has been unlawfully eliminated or foreclosed.

111.    There is no legitimate business justification for the actions and conduct through which Monsanto unlawfully maintained and exercised its monopoly power in the relevant markets set forth above.

112.    As purchasers of Monsanto's herbicides and Monsanto's glyphosate herbicides sold under the brand name Roundup (as well as other brands), Plaintiff and members of the Federal Injunction Class have been injured in their business and property as a result of Monsanto's aforesaid violations of §2 of the Sherman Act. Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the market for

37

glyphosate herbicides and Monsanto would have been forced to lower its prices for Roundup (and its other brands) to competitive levels.

113.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.    Plaintiff and members of the Federal Injunction Class have no adequate remedy at law.

## COUNT IV

### VIOLATION OF W.S.A. § 133.03(1)
### Anticompetitive Tying/Bundling Agreement
### (Claim for Treble Damages under W.S.A. § 133.18)

114.    Plaintiff realleges the factual allegations of the preceding paragraphs of this Complaint and incorporates them into this Count as if set out in full herein.

115.    Monsanto has monopoly power in the relevant markets for biotechnology seed traits, including the market for glyphosate-tolerant seed traits.

116.    Beginning in or around 1999, and continuing to date, Monsanto has engaged in unlawful contracts, combinations, conspiracies and agreements in unreasonable restraint of trade, in violation of W.S.A. § 133.03(1). As a result of Monsanto's anticompetitive agreements and conduct, competition in the market for glyphosate herbicides has been substantially reduced, limited and foreclosed. Monsanto's exclusionary agreements include, for example, (a) exclusionary contracts and agreements with seed companies that have prevented the development of competing herbicide-resistant seeds and the promotion of competing herbicides, and (b) exclusionary agreements with distributors and dealers which have blocked, impeded and/or prevented the ability of rivals selling competing glyphosate to enter the herbicide market, efficiently distribute their product, and/or expand their share of that market.

38

117.    Plaintiffs and members of the Wisconsin Indirect Purchaser Class have been, and/or will be, injured in their business and property as a result of Monsanto's aforesaid violations of W.S.A. § 133.03(1). As a result of Monsanto's conduct, Monsanto has caused Plaintiff and members of the Wisconsin Indirect Purchaser Class to pay artificially-inflated and supra-competitive prices for Monsanto's Roundup glyphosate herbicide. Absent Monsanto's improper conduct, actual and potential competitors would have been able to enter the market and compete with Monsanto on the merits. Had such competition not been unlawfully foreclosed by Monsanto, free and unfettered competition would have forced Monsanto to lower its prices for Roundup herbicides to competitive levels. As a consequence, Plaintiff and members of the Wisconsin Indirect Purchaser Class have sustained substantial losses and damage to their business and property and are entitled to treble damages pursuant to W.S.A. § 133.18.

118.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff and members of the Wisconsin Indirect Purchaser Class have no adequate remedy at law.

## COUNT V

### VIOLATION OF W.S.A. § 133.03(2)
### Monsanto's Unlawful Use/Leveraging of its Seed Trait Monopolies to Eliminate Competition in the Glyphosate Herbicide Market
### (Claim for Treble Damages under W.S.A. § 133.18)

119.    Plaintiff realleges the factual allegations of the preceding paragraphs of this Complaint and incorporates them into this Count as if set out in full herein.

120.    Monsanto has monopoly power in the relevant markets for biotechnology seed traits, including the market for glyphosate-tolerant seed traits.

39

121.    In violation of W.S.A. § 133.03(2), Monsanto has wilfully and unlawfully maintained and exercised its monopoly power in the relevant markets referred to above by seeking to foreclose competition or to gain a competitive advantage in the glyphosate herbicide market (or alternatively the non-selective herbicide market) by the exclusionary and anticompetitve conduct set forth above.

122.    As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has maintained its monopoly or market power in the glyphosate herbicide market (or alternatively has acquired and/or maintained its monopoly or market power in the non-selective herbicide market), and competition in that market has been unlawfully eliminated or foreclosed.

123.    There is no legitimate business justification for the actions and conduct through which Monsanto unlawfully maintained and exercised its monopoly power in the relevant markets set forth above.

124.    As purchasers of Monsanto's glyphosate herbicides sold under the brand name Roundup (as well as other brands), Plaintiff and members of the Wisconsin Indirect Purchaser Class have been injured in their business and property as a result of Monsanto's aforesaid violations of W.S.A. § 133.03(2). Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the market for glyphosate herbicides, and Monsanto would have been forced to lower its prices for Roundup to competitive levels. As a consequence, Plaintiff and members of the Wisconsin Indirect Purchaser Class have sustained loss and damage to their business and property and are entitled to treble damages pursuant to W.S.A. § 133.18.

40

125.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff and members of the Wisconsin Indirect Purchaser Class have no adequate remedy at law.

## COUNT VI

### VIOLATION OF W.S.A. § 133.03(2)
### Monsanto's Unlawful Maintenance of its Glyphosate Herbicide Monopoly
### (Claim for Treble Damages under W.S.A. § 133.18)

126.    Plaintiff realleges the factual allegations of the preceding paragraphs of this Complaint and incorporates them into this Count as if set out in full herein.

127.    Monsanto has monopoly power in the glyphosate herbicide market.

128.    In violation of W.S.A. § 133.03(2), Monsanto has wilfully and unlawfully maintained its monopoly power in the glyphosate herbicide market through the coercive, exclusionary and anticompetitve conduct set forth above.

129.    As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has maintained monopoly or market power in the glyphosate herbicide market, and competition in that market has been unlawfully eliminated or foreclosed.

130.    There is no legitimate business justification for the actions and conduct through which Monsanto unlawfully maintained and exercised its monopoly power in the relevant markets set forth above.

131.    As purchasers of Monsanto's herbicides and Monsanto's glyphosate herbicides sold under the brand name Roundup (as well as other brands), Plaintiff and members of the Wisconsin Indirect Purchaser Class have been injured in their business and property as a result of Monsanto's aforesaid violations of W.S.A. § 133.03(2). Absent Monsanto's anticompetitive and unlawful

41

conduct, actual and potential competitors would have been able to enter and freely compete in the market for glyphosate herbicides and Monsanto would have been forced to lower its prices for Roundup (and its other brands) to competitive levels. As a consequence, Plaintiff and members of the Wisconsin Indirect Purchaser Class have sustained loss and damage to their business and property and are entitled to treble damages pursuant to W.S.A. § 133.18.

132.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff and members of the Wisconsin Indirect Purchaser Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendant Monsanto Company and requests the following relief:

A.    That the Court certify that this action may proceed and be maintained as a class action pursuant to Fed.R.Civ.P. 23(b)(2); designate Plaintiff as a representative of the Federal Injunction Class and designate Plaintiff's counsel as class counsel;

B.    That the Court find and declare that Monsanto has committed the violations of federal antitrust law as alleged herein;

C.    That the Court enter a judgment against Monsanto and enjoin Monsanto's continued violation of federal antitrust law pursuant to 15 U.S.C. § 26;

D.    That the Court certify that this action may proceed and be maintained as a class action pursuant to Fed.R.Civ.P. 23(b)(3) on behalf of an Wisconsin Indirect Purchaser Class; designate Plaintiff as the representative of the class and designate Plaintiff's counsel as class counsel;

42

E.       That the Court find and declare that Monsanto has committed the violations of Wisconsin antitrust law as alleged herein;

F.       That the Court enter a judgment against Monsanto in favor of the Wisconsin Indirect Purchaser Class and award money damages, including treble and compensatory damages as authorized by state law;

G.       That the Court order Monsanto to pay the costs of this action, including but not limited to plaintiff's attorneys' fees; and

H.       That the Court award such other and further relief as this Court may deem just and proper.

Dated: February 27, 2007

By: _____

Jeffrey S. Goddess (Del. Bar No. 630)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
*Attorney for Plaintiff*

**_Additional Plaintiff's Counsel_**

GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Noah H. Silverman
Joseph Opper
1501 Broadway, Suite 1416
New York, NY 10036
Tel:  (212) 398-0055
Fax: (212) 764-6620

KOZYAK TROPIN & THROCKMORTON, P.A.
Adam Moskowitz
T. Tucker Ronzetti
Michael S. Olin
David M. Buckner
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

ODOM & DES ROCHES, LLP
John Gregory Odom
Stuart E. Des Roches
Charles F. Zimmer, II
650 Poydras Street
Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

BERGER & MONTAGUE, P.C.
Daniel Berger
Eric Cramer
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Lance A. Harke, Esq.
HARKE & CLASBY, LLP
155 S. Miami Avenue, Suite 600
Miami, FL 33130
Tel: 305-536-8220
Fax: 305-536-8229

PERCY, SMITH & FOOTE, LLP
David P. Smith
W. Ross Foote
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

Michael Miller
Law Office of Michael Miller
926 Chulie Drive
San Antonio, TX 78216
Tel: 210-225-6666
Fax: 210-225-2300

44

≈JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS
CENTURY ACRES, INC., on behalf of itself, and all others similarly *

**DEFENDANTS**
MONSANTO COMPANY

**(b)**  County of Residence of First Listed Plaintiff  **Ozaukee,**
(EXCEPT IN U.S. PLAINTIFF CASES)  **Wisconsin**

*situated

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)  **(302) 656-4433**
Rosenthal, Monhait & Goddess, P.A.
PO Box 1070, Wilmington, DE  19899-1070

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                             and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Sherman Act, 15 U.S.C. §§ 1 and 2.   Civil antitrust action by end
Brief description of cause:  purchasers in connection with defendant's monopolization
of market for glyphosate herbicides (sold as Roundup)

## VII. REQUESTED IN
COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY
(See instructions):
JUDGE  04-305 SLR  06-599 SLR
05-535 SLR  06-600 SLR   DOCKET NUMBER  07-100 UNA

DATE
2/27/07

SIGNATURE OF ATTORNEY OF RECORD
Jeffrey S. Goddess, Esq. (No. 630)
Rosenthal, Monhait & Goddess, P.A.

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 07 CV 123

# ACKNOWLEDGMENT
## OF  RECEIPT  FOR AO FORM  85

### *NOTICE OF AVAILABILITY OF A*
### *UNITED STATES MAGISTRATE JUDGE*
### *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____3_____ COPIES OF AO FORM 85.

_2/27/07_
(Date forms issued)

_____
(Signature of Party or their Representative)

B. Douthwaite
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action